BROWN & ROOT, INC., et al. *v.* CONTINENTAL SOUTHERN LINES, INC., et al.

No. 40014          May 7, 1956          87 So. 2d 257

16

June 11, 1956                                    87 So. 2d 926

*Laub, Adams, Forman & Truly,* Natchez; *Watkins & Eager,* Jackson, for appellant.

18

*Brandon, Brandon, Hornsby & Handy,* Natchez, for appellee, M. T. Stewart.

*Butler, Snow, O'Mara, Stevens & Cannada,* Jackson, for appellee and cross-appellant, Continental Southern Lines, Inc.

ROBERDS, P. J.

This litigation grows out of a collision between a two-ton Ford truck and a passenger bus. The accident occurred on U. S. Highway 61 some two and a half miles north-east of the corporate limits of the City of Natchez between 6:30 and 7:00 o'clock on the morning of September 12, 1953. Highway 61 runs generally north and south, but at the place of the accident, and for some distance on either side thereof, it runs northeasterly and southwesterly. However, we will designate points as being north or south of the scene of the accident. Both vehicles were traveling north, and the bus was in the act of passing the truck when the collision happened. The bus was being operated by Continental Southern Lines, Inc., and M. T. Stewart, servant of said Lines, Inc., was the driver thereof. The truck was being operated by Brown & Root, Inc., and Homer Nations, its employee, was driving it.

Brown & Root, Inc., initiated the litigation. In its declaration, filed against the Lines, Inc., and Stewart, the driver of the bus, it asserted, as grounds for liability on the part of the defendants, that the bus undertook to pass the truck without giving any notice, sign or warning of such intention, and negligently collided with the truck, knocking it from the road, and causing property damage to the truck in the amount of $1,675.37.

Both defendants answered the declaration and denied all negligence and liability on their part. Both made counter-claims against Brown & Root, Inc., asserting that Nations, the driver of the Ford truck, without signal of warning, turned abruptly and suddenly to the left and across the north lane of the highway, into the path of the bus, colliding therewith. The Lines, Inc., claimed property damage to the bus in the sum of $11,225.95, and Stewart first asked for damages against Brown & Root, Inc., for personal injuries in the sum of $20,000.00, which claim, by later amendment, was increased to $35,000.00, actual and punitive damages.

The jury awarded nothing to Brown & Root, Inc. It found for Stewart in the sum of $35,000.00 and for the Continental Southern Lines, Inc., property damage in the amount of $2,806.48. Judgments were entered accordingly. Brown & Root, Inc., appeal from both judgments. Continental Southern Lines, Inc., cross-appealed, contending that the verdict of the jury settled the question of liability but that the proof was undisputed as to the amount of actual damage suffered by it, and that we should either render judgment for the sum of $11,225.95 or remand the case to be again tried upon the issue alone of the extent of the damage suffered by cross-appellant.

We will first consider and pass upon the contentions of Brown & Root, Inc., and, lastly, dispose of the issue of damages involved in the cross-appeal.

Brown & Root, Inc., say the verdict of the jury, denying recovery by it and imposing liability at the instance of the two cross-claimants, as shown above, was against the great weight of the evidence and the case should be reversed and remanded for trial before another jury on the question of liability.

Homer Nations, driver of the truck, testified that he was 29 years of age, married, had been driving trucks and motor vehicles of various types for a number of years; that he had been employed by Brown & Root, Inc., for about four years; that on the morning of this accident he had been instructed by his employer to drive the Ford truck from the Company's office, located just north of the city limits of Natchez, to Jackson and bring back a piece of machinery and he was on his way to Jackson when the accident happened; that he was proceeding down a slight incline on Highway 61, which is a paved highway, and that he looked to his rear and saw the passenger bus as it came over a slight incline some six hundred feet to his rear; that he was driving some 35 miles per hour; that he did not see the bus again until the collision took place; that his home was about 100 feet north

of Highway 61 and that he had decided to go to his home and tell his wife where he was going; that he slowed his truck to about 5 to 8 miles per hour; gave a left turn signal and then proceeded to turn to the left to cross the north lane of the highway and go up the side road to his home; that he did not know the bus intended to pass him, or was in the act of passing him, until it struck the truck; that the bus horn blew about the time of the collision. He said, "* * before he hit me he blowed his horn—electric horn. It was just before he hit the truck, almost at the same time." He was asked, "Q. Now, at the point where this collision occurred, how much of your truck was extending over the center line of the pavement to your right, to your best estimation? A. I would say three feet." Again he said, "I had already made my turn when he hit me. Yes, I had started my turn." He said the bus hit the truck about a foot and a half behind the cab of the truck. He estimated the bus was running between 50 and 55 miles per hour. The truck overall was 19 feet long. From the front of the truck to the back of the cab was 8 feet. The truck had a cab and a flat body to the rear of the cab. No vehicle was approaching from the opposite direction. The road was straight and visibility good for eight hundred feet south to the top of the incline and for considerable distance north of the place of the accident. The testimony of this witness on the vital question as to whether he gave a proper signal that he was going to turn across the road might have been weakened some in the minds of the jurors by this incident: Some 200 feet to the south of the scene of the accident, and on the north side of the highway, is located Lewis' Filling Station. He said that as he passed that station he spoke to a boy standing at the station "* * and I dropped my hand on down. I just spoke to him like that and dropped my hand on down." It was for the jury to say whether that described a proper signal for a left turn across the north lane of the road.

Nations was the only eyewitness placed upon the stand by Brown & Root, Inc., except Stewart, who was called as an adverse witness, and who was later recalled by defendants and cross-claimants, and whose testimony we will discuss hereinafter.

Appellant introduced J. C. Smith. He was superintendent for Brown & Root, Inc., and he gave Nations the instructions to drive the truck to Jackson and return with the machinery part the day of the accident. He said Nations was a careful, qualified, competent driver of trucks; that this truck weighed between ten and eleven thousand pounds and was 8 feet wide. He identified a number of photographs of the two vehicles after the wreck and of the scene of the accident. It might be here stated that the truck went off the pavement in a northeasterly direction and stopped 118 feet from the scene of the contact between the two vehicles and the bus went off the pavement in a northwesterly direction and landed in a ravine 140 feet from that point.

Appellant introduced Mr. Chandler Jordan, a civil engineer. From information given him and that gathered from his own inspection he had made some plats of the immediate and surrounding area about the scene, showing the respective physical locations of houses along the highway, and the highway itself, and the spots where the vehicles came to rest after the accident. One plat showed two white posts standing at the entrance to the side road leading to the home of Nations. These posts were 40 feet north of highway 61. The points and objects depicted upon the plats were also shown on photographs which were introduced on the trial.

Mr. M. T. Stewart, a defendant in the declaration and a counter-claimant, was called as an adverse witness and then took the stand in his own behalf. Condensing his testimony, he said he was the driver of the bus. He had a wife and three children. He was 33 years of age. He had been driving a passenger bus for Continental South-

ern Lines, Inc., for six years; he had driven five years over this same route; he was driving the bus the day of the accident; the bus was 35 feet long, 8 feet wide and 10 feet high. It had air brakes. They were in good condition; that he left the bus station at Natchez at 6:30 that morning; that he was going to Jackson, Miss., by way of Vicksburg; in going to Vicksburg he was traveling U. S. Highway 61; that as he went over the crest of a slight incline he saw the Ford truck ahead of him descending on the east side of this elevation; that the truck was then about 250 to 300 feet from his bus, both vehicles traveling in the same direction; he estimated the crest of the incline to be some 900 feet south of the point of the accident; that as he came over the crest he was running about 30 miles an hour, being within a 40-mile speed zone; that the truck was running some 20 to 25 miles an hour; that he reduced his speed to about 25 miles per hour; that later the truck again reduced its speed and he prepared to pass it. He looked ahead and to the rear to be sure no other vehicles were approaching from either direction, and there being none, he blew his horn as a signal to the truck driver that the bus was about to pass; that he increased his speed, turned into the left, or north, lane, and as he approached the truck he gave another signal that he was passing; that suddenly the truck turned across the road to the left into the north, or left, lane, causing the collision between the two vehicles. He testified that the driver of the truck gave no signal or warning of any kind of his purpose to turn across the road and into the north lane of travel. He said the truck hit the "front wheels" of his bus; "from the front wheels out"; that the truck had just come over the center line going to the north. He said the truck did not slow its speed sufficiently to indicate that it intended to turn across the north lane of travel, and he had no indication this was going to happen. He said he did not know of the existence of the gravel road

leading from highway 61 to Nations' home. He said it was very dim; Weeds had grown in it, and he thought it was a gravel shoulder of Highway 61. He then described his injuries, which we will detail later.

T. E. Blackledge was in an automobile behind and following the bus. The bus was running about 30 to 35 miles an hour as it descended on the east side of the incline. He was 150 feet behind the bus. The bus turned into the left lane and the driver blew his horn, giving a warning of his intention to pass the truck. Witness could see the truck. The driver of the truck gave no warning or signal that he was going to turn to the left across the north lane of the road. He was in position to see the signal had it been given. He said when the bus horn blew the truck veered a little to the right. The bus was traveling 30 to 35 miles per hour. When the bus horn warning was given the bus was in the left lane and the truck was in the right lane, and the truck was about 20 feet ahead of the bus. The collision knocked the truck to the right and the bus to the left. He also said "* * the front part of the truck hit the bus in the front and the truck looked like it hit right behind the door of the truck."

George W. Furr was a passenger on the bus. He was sitting on the seat behind the bus driver and next to the aisle. He could and did see the truck in front. He never saw any signal by the truck driver that he intended to pull across the road to the left. He said the warning horn was blown by the bus driver as he pulled into the left lane to pass the truck. The bus was running about 35 miles an hour and the truck about twenty miles per hour.

E. C. Striebich was a passenger on the bus riding on the front seat on the right side of the bus. He saw the truck ahead when the bus came over the crest of the hill. He never saw any signal or warning by the truck driver that he expected to turn into the left lane. He was in

position to see such signal had it been given. He testified "We came on up along side of the truck and just about the time we were passing the truck turned to the left." He further said the front of the bus was along side the back of the truck when the truck suddenly turned to the left. He saw the truck turn to the left and he grabbed the rail in front of his seat in anticipation of a wreck. He said the left wheels of the truck got two feet across the center of the road. He frankly said he did not remember whether the bus horn blew or not.

Aubrey F. Coker was at the Lewis gas station on the north side of the highway some 200 feet south of the scene of the accident. He heard the crash and ran to the scene and rendered such aid as he could.

Franklin Williams worked at the Lewis Service Station; heard the crash and ran with Coker to the scene.

James Lewis, an engineer, made a map or plat of the area, showing houses, physical orjects, etc. The pavement on the road was 20 feet wide. Starting at the crest of the hill the distance was 300 feet to Wheat's Service Station; 600 feet to Lewis' Service Station, and 825 feet to the road leading from the highway to the home of Nations.

The testimony of the remainder of the witnesses was directed to the extent of the personal injuries to Stewart and the damage to the bus and to an effort of appellant to discredit the testimony of Blackledge. This will be detailed later as needed to pass upon contentions which have been raised by the very able attorneys in this case.

■■ ■ It is evident, we think, that determination of the controlling questions in this case—that is whether Nations gave any signal or warning he was going to turn into the left lane and whether Stewart gave any signal or warning he was going to pass the truck, and whether Stewart knew, or should have known, as a reasonable man, Nations was turning into and cross the left lane of the road—were questions for the jury to pass

upon under the testimony in this case, which testimony we have tried to fairly set forth.

Appellant says the photographs disprove the oral testimony as to the parts of the vehicles which came into contact. That is true, to some extent, as to some of the oral testimony. However, the witnesses, in oral testimony, were giving their best judgment as to the parts of the vehicles which came together. We have examined the photographs carefully. As best we can conclude from them the right front end, including the right front door; of the bus came into contact with the left front end, beginning as far back as the left front door, of the truck. The pictures do not disprove the oral testimony of the vital questions of signals and warnings or lack of them.

It is next contended by appellant that Nations, when the accident happened, had departed from his line of duty and was not then the servant of appellant. As above stated, Nations resided about 100 feet north of Highway 61. He said he intended to drive to his home and inform Mrs. Nations he was going to Jackson, and that he was in the act of turning off Highway 61 and into the by-road leading to his home when the accident happened. We think there are to answers to this contention: One is the jury could have found from all of the evidence that he had not in fact departed from his line of duty and embarked upon this private mission when the accident occurred, and the second is that if he had started upon such private mission that the deviation was so slight, as a matter of law, as not to take him out of his line of duty as a servant of appellant. On the first proposition, the question of fact, it will be noted that some of the witnesses, notably Blackledge, testified that when the accident happened Nations was mainly within the right lane of traffic. The second proposition is sustained by the recent case of D. Colotta v. Phillips, (Miss.) 85 So. 2d 574. In that case the servant, driving the master's truck, had been to Baird to deliver produce,

for which he collected the purchase price. He was supposed to return to the master's place of business in Indianola. He did come within a block thereof, but instead of going to the place of business he drove south five or six blocks, then turned west for two blocks and turned north on Church Avenue. Court Avenue, on which Colotta's place of business was situated, was an extension of Church Avenue. The driver's home was the second house on Church Avenue after he turned north on that Avenue. Moon, the driver of the truck, testified he was going by his home to ascertain what his wife wanted for supper, and he intended to then continue north on the same street to his master's place of business. When Moon turned to the left to cross the street to his home he ran over a pedestrian. This Court held that this was not such a deviation by Moon from his line of duty to his master as to relieve him of his character as a servant. The Court, by quotations from authorities, set out the rules and principles to be considered in such cases, which we deem unnecessary to restate here. In the case at bar, Nations' intention and actions did not constitute such a deviation from his duty to his master as to strip him of his relation as an employee of appellant.

Appellant says the amount of the verdict in favor of Stewart is so excessive as to show that it was the result of prejudice, bias and passion. The court instructed the jury that it could not impose punitive damages, so we must assume $35,000.00 was considered by the jury as actual damages, although Stewart insists that this is not necessarily true, since, as he contends, a jury may impose punitive damages without express permission of the court and even though instructed by the court not to do so. We do not pass on that question.

Stewart was 33 years of age when the accident happened. He was in good health. He had driven a passenger bus for 6 years. He had a splendid record. He

was making about $95.00 per week in that work. He had a wife and three children—ages, three, five and seven years. He was their sole support.

When the collision took place his right foot got caught in the brakes of the bus. The brake peddle went through his ankle. He had to be gotten out by use of an axe and a saw. He was confined for fifteen minutes and suffered great pain according to all the proof. He was rushed to the Natchez General Hospital after the accident. Dr. Dudley H. Metzeiger treated him at that hospital. X-rays were made. Dr. Metzeiger described, in part, his condition in these words: "He had multiple contusions to his hips and legs. There was also a small fracture of the astragalus bone on which the weight of the leg is distributed to the foot, in other words, the intermediate bone between the foot and the two bones of the leg." He also said "X-rays of the right ankle revealed an avulsion fracture of the right tibia, medial malleolus. That means a fracture which has been torn loose from the medial service of the big bone where it joins the ankle bones". Again, the Doctor called the injury "A compound fracture". He explained "A compound fracture is such as there is a broken bone and there is a wound to the outside, and this is much more difficult to handle because these areas at the bone have a low blood supply". From the time he went to the Natchez General Hospital to the time he was later taken to Touro Infirmary, as hereinafter shown, he spent some eighty days in the Natchez General Hospital. He was operated upon a number of times under anesthesia. He was not doing well. Dr. Metzeiger testified "All this time the disability was present in the ankle. He had lack of dorsiflexion, which means putting the foot up, and plantar flexion, which means putting it down. He was more or less locked in between the two because when you have a fracture where these big bones of the leg articulate with the small bones of the foot, any such fracture, of course, is fraught with

more dangers than a fracture up here'' This witness estimated the permanent damage to his leg and ankle to be thirty-five percent.

In August 1954, Dr. Metzeiger sent Stewart to Dr. ichard Vincent, a plastic surgeon, at Touro Infirmary, New Orleans. Dr. Vincent described his condition in these words: ''The patient had scarring over the medial aspect or the inner aspect of he right ankle. That was over the internal malleolus, which is the lower end of the bone, the lower end of the tibia. * * * The patient walked with a limp. He had limitation of ability to move the ankle and limitation of both dorsiflexion and plantar flexion''. He explained that dorsiflexion has reference to the ability to move the foot upward and plantar flexion has reference to bending the foot downward. From the time Stewart entered Touro in July 1954 until his last visit there in January 1955, he had been in and out of that Infirmary some twelve different times, remaining therein from one to three weeks on the various visits. He underwent a number of operations. In each hospital he spent some three weeks with his legs tied together in what is called a ''cross-leg flap'', during which time he had no freedom of movement. Dr. Vincent estimated his permanent disability at ten percent. The hospital and doctor bills had aggregated $3,521.92 at the time of the trial. He had not been able to work or realize any income from September 12, 1953, the date of the injury, to the time he testified in this case in January 1955.

■■ We have frequently said that fixing the amount of money damage in personal injury cases is a difficult thing to do, and that this primarily is the province of the jury. We should not disturb the verdict unless the amount is so excessive or so small as to be against the great weight of the evidence and shows the verdict was the result of passion, prejudice or bias.

■■ We have labored to set forth the nature and effect of Stewart's injuries because the amount of the

verdict has given us much concern. However, considering his age, his life expectancy, his earning capacity before the injury, the pain and suffering he underwent, the nature of his injuries, his permanent loss of earning power, and the other facts and elements entering into the question of damage, we are not able to say that the amount of this verdict is so excessive as to show that it was the result of passion, bias and prejudice. Southern Beverage Co. v. Barbarin, 219 Miss. 493, 69 So. 2d 395.

Appellant criticizes a number of instructions granted appellees. The wording of some of these is inapt but, reading all the instructions granted in the case together, as is our duty, we do not believe, and we cannot say, that the jury was mislead by them, or did not understand the issues, or that the granting of the criticized instructions was reversible error.

██ ██ Continental Southern Lines, Inc., in its cross appeal, says that the verdict of the jury adjudicated that appellant was negligent and was liable to it, and that cross-appellant established without dispute that the amount of damage to the passenger bus was $11,225.95, and cross-appellant asks that we enter judgment here in its favor and against appellant for that amount. It is true that the jury verdict did settle the question of liability but the evidence in this record on the question of damage to the bus does not warrant us in rendering judgment for the above claimed amount of damage to the bus. In the recent case of National Fire Insurance Company of Hartford v. L. B. Slayden, et al, decided by this Court on March 19, 1956, we said, "Where costs of repairs are relied upon as the measure of damages, the proof must establish (1) that the repairs were necessary as the result of the wrongful act, and (2) that the cost was reasonable * * * The repair bills are insufficient to establish the necessity for the repairs, and the probable cost of the repairs does not satisfy the rule as to proof

of necessity''. The Court further observed in that case, ''The proof of necessity for the repairs, as well as the reasonableness of the cost (which was not in issue because of the stipulation) could best be made by the mechanics who did the repair work * * *'' In that case we reversed and remanded for a new trial on the issue of damages alone. The proof of damage to the bus, as made in the trial of this case, does not comply with the requirements of such proof as announced in the National Fire Insurance Company case, supra.

The case will be affirmed as to judgment of Stewart against appellant Brown & Root, Inc., and as to the liability of Brown & Root, Inc., to Continental Southern Lines, Inc., for damage to the bus, but will be reversed and remanded for new trial alone upon the question of the amount of damage to the bus.

Affirmed on direct appeal, and affirmed in part and reversed in part on cross appeal, and remanded.

*Hall, Kyle, Holmes* and *Gillespie, JJ.,* concur.

## ON SUGGESTION OF ERROR

HALL, J.

On May 7, 1956, we affirmed this cause on direct appeal and we affirmed it in part and reversed it in part and remanded it for a new trial as to the liability of appellant to Continental Southern Lines, Inc., for damage to the bus, the new trial to be solely upon the question of the amount of damage to the bus.

The appellant has filed a vigorous suggestion of error which we have carefully considered and we are of the opinion that the same should be overruled.

The appellant fears that on a new trial it will not have the right to present to the jury all facts with reference to contributory negligence. ██ ██ We think that it is sufficiently clear from the original opinion in this case that the remand for a new trial as to the amount of

damage to the bus means that upon another trial of this issue both parties will be entitled to offer any evidence available bearing on that question, including evidence of contributory negligence which might go to the question of diminishing the damages which might be proved by Continental Southern Lines, Inc., and this opinion is written solely in order that there will be no confusion in the mind of the trial court as to the issue which is to be tried again.

Suggestion of error overruled.

All justices concur except *Holmes, J.,* who took no part.