NEW ORLEANS & NORTHEASTERN RAILROAD COMPANY, et al.
*v.* THORNTON

No. 43314          March 8, 1965          172 So. 2d 560

*Pack & Ratcliff, Warner Beard, Jr.,* Laurel, for appellants.

*Melvin, Melvin & Melvin,* Laurel, for appellee.

KYLE, P. J.

This case is before us on appeal by New Orleans & Northeastern Railroad Company and Lias Thigpen, an employee of the Railroad Company, defendants in the court below, from a judgment of the Circuit Court of the Second Judicial District of Jones County, rendered in favor of Mrs. Melba Thornton, plaintiff, in an action for damages for personal injuries sustained by the plaintiff as the result of the appellant Railroad

Company's two and one-half ton truck, which was being driven by the defendant, Lias Thigpen, colliding with a 1959 Ford automobile in which the plaintiff was riding; and which was being driven by the plaintiff's mother-in-law, Mrs. T. C. (Jane) Thornton.

The accident occurred on December 8, 1960, at approximately 5:30 o'clock P.M. at a point near the center of the intersection of Teresa Street and U. S. Highway No. 11 North and State Highway No. 15, approximately 300 feet east of the railroad underpass, in the City of Laurel. The 1959 Ford automobile in which the plaintiff was riding at the time of the accident had passed under the overhead bridge and was proceeding northwardly on U. S. Highway No. 11 in its own north-bound lane of travel. The two and one-half ton truck which collided with the Ford automobile was proceeding southwardly on Highway No. 11, and the accident occurred when the truck crossed over the center of the highway and skidded against the automobile in which the plaintiff was riding as the driver of the automobile brought her vehicle to a stop in her own lane of travel immediately west of a traffic island in the center of the highway intersection. The proof shows that a drizzling rain was falling and the pavement was wet at the time the accident occurred, and there was heavy traffic on both highways approaching the intersection.

The plaintiff alleged in her declaration that the defendant Thigpen was driving his truck at a highly dangerous rate of speed as he approached the intersection; that the defendant negligently failed to keep a proper lookout for other motorists using the highway, and negligently failed to have his truck under proper control; and that, because of such excessive speed and such negligent failure to keep a proper lookout and have his vehicle under proper control, the defendant lost control of his truck and negligently caused his truck to slide sideways into the northbound lane of travel and collide with the automobile in which the plaintiff was riding.

The case was before us on a former appeal, in Cause No. 42,735, wherein the Court reversed a judgment for $33,417 rendered in favor of the plaintiff and remanded the case for a new trial because of error of the lower court in granting a peremptory instruction in favor of the plaintiff on the issue of liability. See New Orleans & Northeastern Railroad Co. v. Mrs. Melba Thornton, 247 Miss. 616, 156 So. 2d 598 (1963).

The opinion rendered on the first appeal contains a brief summary of the testimony offered on behalf of the respective parties during the first trial. The testimony offered on behalf of the respective parties during the second trial, as shown by the record that we now have before us, was substantially the same as that offered on behalf of the respective parties during the first trial. All issues as to liability and damages were submitted to the jury, which returned a verdict in favor of the plaintiff for $42,500. The defendants' motion for a new trial was overruled, and a judgment was entered in favor of the plaintiff for the above stated amount. From that judgment the defendants have prosecuted this appeal.

The appellants' attorneys have assigned and argued four points as grounds for reversal of the judgment of the lower court:

1. That the court erred in granting the plaintiff's instructions which appear on pages 31, 32, 33, 34, 40 and 44 of the record, and which, in the opinion of the appellants' attorneys, were equivalent to a peremptory instruction on liability.

2. That the court erred in erroneously instructing the jury that they might, in assessing damages, compensate the plaintiff for all "substantial disfigurement resulting from physical injuries, if any."

3. That the court erred in permitting the appellee and the appellee's brother-in-law, who was 16 years old at the time of the accident, over the appellants' ob-

jection, to estimate the speed of the appellants' truck at 40 miles per hour; also, that the court erred in prejudiciously restricting the appellants' effort to show by the witness Reddock that there had been other vehicles, on other occasions, which had skidded at the point on the paved street where the blacktop joined the concrete, such evidence being admissible to show the dangerous character of the place where the wreck occurred.

4. That the verdict of the jury was grossly excessive and the trial court erred in overruling the appellants' motion for a new trial.

■■ ■ We have carefully reviewed the instructions complained of in the appellants' first assignment of error, and we find no error in the instructions of sufficient importance to justify a reversal of the judgment of the lower court. We think the court erred in granting the instruction complained of in the appellants' second assignment of error which appears on page 37 of the record, in the form requested. In that instruction the jury was told that, if they should find for the plaintiff, in the assessment of damages they might take into consideration, in addition to other elements of damages, ''all substantial disfigurement resulting from physical injuries, if any.'' In our opinion there is no substantial evidence in the record to support a finding that the plaintiff suffered a permanent disfigurement as a result of the sprained ankle or the exploratory operation hereinafter referred to, which was performed by Dr. E. J. Holder on November 14, 1961; and the disfigurement clause in the above mentioned instruction should have been stricken before the instruction was given. Vascoe v. Ford, 212 Miss. 372, 54 So. 2d 541 (1951). But the error complained of, in our opinion, was not of such importance as to justify a reversal of the judgment.

■■■ ■■ We are also of the opinion that the errors complained of in the appellants' third assignment of

errors are not of sufficient importance to justify a reversal of the judgment.

■■ ■ We think the amount of damages awarded by the jury, however, is so grossly excessive, in view of the nature of the injuries complained of, as to evince bias and prejudice on the part of the jury, and the judgment appealed from must be reversed on that account, unless the appellee agrees to enter a remittitur of $12,500, thereby reducing the amount of the judgment to $30,000.

Two doctors testified on behalf of the plaintiff concerning the plaintiff's injuries.

Dr. G. E. Holder, Director of the Masonite Hospital and Clinic, testified that the plaintiff, according to the hospital record, came into the out-patient department of the clinic at 7:30 P.M. on December 8, 1960, and stated to the nurse in charge that she had been involved in an automobile accident. The plaintiff was examined by the nurse on duty and her blood pressure was taken. Doctor Beech was called on the telephone and gave the nurse instructions to have the patient return to the clinic the next morning, since the nurse did not think that the plaintiff's injuries required emergency treatment that night. Dr. Holder testified that the plaintiff returned to the clinic the next morning and gave him a history of her injury as the result of an automobile accident. The doctor examined the patient's ankle and found that it was swollen and tender. The ankle was x-rayed, and no fractures were found; but the ankle was swollen and stiff, and the patient complained of pain when the ankle was moved. The doctor strapped her ankle with gauze-tex to support the ankle and keep it from turning; and the patient was advised to walk on her foot as much as possible. The doctor saw the patient again on December 14. Her ankle was still painful, and she was unable to wear any type shoe except house shoes. The doctor saw the patient again on Janu-

ary 5, 1961, and found that there was still swelling and tenderness of the ankle. Another x-ray was made, which revealed no fractures. The doctor saw the patient again on January 13. Her ankle appeared to be some better but was still swollen. On February 24 the patient still complained of pain and inability to wear a shoe other than a house shoe, and the doctor referred her to the Laurel Bone and Joint Clinic for further treatment. The doctor stated that his diagnosis of the plaintiff's condition was that she had a severely sprained ankle, and he thought that if she could be helped the Laurel Bone and Joint Clinic would be able to help her. The doctor stated that the plaintiff came to the Masonite Clinic for a general checkup on July 19, 1961; that she was still complaining about her ankle, which was still swollen some at that time.

On cross-examination the doctor stated that he did not observe any swelling in the plaintiff's left ankle during the time he treated her. The doctor was then asked whether the patient at any time complained to him of an injury to her back, neck and shoulders. His answer was, "Not that I recall." He also stated that he had not treated the patient for any such injury. The doctor was asked whether he had any knowledge as to whether the patient was given a shot of some kind during her visit to the hospital two or three hours after her injury. His answer was that, if she had been given a shot of some kind during her visit to the hospital, the hospital would have had a record of it, and there was no record of any shot having been given her.

Dr. E. J. Holder, an orthopedic surgeon at the Laurel Bone and Joint Clinic, testified that he saw the plaintiff, Mrs. Melba Thornton, the first time on March 8, 1961; that she had been referred to him for examination and treatment by Dr. G. E. Holder. The doctor stated that he examined the plaintiff and found that she had swelling and pain in the region of the lateral malleolus, which is

the outside portion of the ankle. The swelling was over the front part of the ankle. The doctor's diagnosis was a sprain of the right ankle. There was some limitation in the movement of the ankle on her first visit, and the doctor put a needle into the joint and injected two CCS of the Hy-Delta TBA, which is a cortizone preparation. He then placed her in a boot cast which remained on her foot approximately three weeks. The boot cast was removed on March 29, and the plaintiff was advised at that time to put part of her weight on the ankle, the rest on her crutches. A week later the plaintiff still had some swelling in the ankle, but apparently less than on March 29. The doctor stated that he saw the plaintiff again on April 10, and he advised her to go to full weight bearing if she could, to put all of her weight on her ankle and gradually discard the crutches. The doctor saw the plaintiff again on April 19. There seemed to be more swelling and tenderness in the ankle, and another injection of cortizone was put into the ankle joint. This was done by a needle and syringe. A local anaesthetic was used to minimize the pain incident to the injection of the cortizone. The ankle was aspirated at the time the cortizone was injected. That was done to get the excess synovial fluid, which is a straw-colored fluid, out of the joint. The doctor stated that after the injection of the cortizone the swelling at times subsided; at other times it appeared to be worse. The doctor stated that the joint of the sprained ankle was x-rayed on two other occasions to see if anything had changed, and all of the x-rays were normal. The excess fluid was withdrawn on three occasions, in lesser amounts each time, to relieve distention of the lining of the synovium, the membrane that lines the joint.

The doctor stated that when Mrs. Thornton came to see him the first time she was using crutches, and during the time between March 8 and November 13, 1961, she used either one or two crutches. She was seen at in-

tervals during that time and continued to have swelling and pain and discomfort, especially on weight-bearing; and on November 14 an exploratory operation was performed on her ankle. The incision was made over the front of the ankle joint. The area in between the two bones was exposed, and the excessive amount of tissue, which the doctor thought was being continuously irritated by motion, was removed. The rest of the joint was explored, and appeared to be all right. The doctor was asked if the operation was painful. His answer was that at the time of the operation there was no discomfort for the reason that the patient was asleep; but there was some pain and discomfort afterwards, and the patient was given medication to relieve the pain. The doctor stated that the plaintiff remained in the hospital four days and was discharged on November 17. After that she continued to have swelling and pain in her ankle.

The doctor stated that the plaintiff had suffered a severe sprain of the ankle with a torn talo-fibula ligament, following which she had developed an inflamatory condition called traumatic arthritis, as a result of the injury. The doctor was asked whether the swelling in her right ankle was a normal or abnormal condition for a woman of the plaintiff's age. His answer was, that the swelling was abnormal and the injury was a painful type of injury for a person of her age. The doctor stated that the swelling extended about an inch and a half above the ankle and the entire foot was swollen. At night the swelling would go down, but the swelling in the joint persisted. The doctor stated that the plaintiff had swelling in both feet; but she had much more swelling in the right foot than in the left foot. He stated that the ankle injury, no doubt, had increased the amount of swelling in that foot; but he was certain that the plaintiff had some other circulatory disturbance which was causing some swelling in both feet. The doctor was of the opinion that the plaintiff had some permanent injury, and if

she continued to have much pain and discomfort "somewhere down the line there may have to be something done." But he did not think anything else should be done immediately. The doctor stated that there was a probability that something else should be done later; that a fusion of the joint might become necessary; that a fusion would eliminate the motion in the ankle, but the plaintiff would still have motion in her toes and other portions of her foot. The doctor said, "Usually they get along quite well with this, with some limitation." A fusion would be done to relieve pain and would stop or reduce the swelling.

On cross-examination the doctor stated that the swelling in the plaintiff's left ankle was not related to the injury complained of, and for that reason he referred her to her general physician to find out, if he could, what was causing the swelling in the left ankle. The doctor stated that from his own examination he had concluded that the plaintiff had an edema, which meant that the tissue of the ankle was retaining fluid. The doctor stated that edema does not affect the joints primarily. The doctor stated that when he first saw the plaintiff his diagnosis was that it was a sprained ankle, and he still described it as a sprained ankle; that the x-ray showed no bone injury or malformation or breaks or fractures of the bone; and when the incision on the outside of the ankle was made on November 14, 1961, he found nothing wrong with the bone. There was no malformation of the ligament after it had healed. The doctor stated that the plaintiff had gained considerable weight since he first saw her; that she had considerable swelling in both ankles at the time of the first trial; and that she still had some swelling in both ankles at the time of the second trial. The doctor stated that he had not treated the plaintiff for any back injury or neck or shoulder injury.

The record shows that the appellee was 21 years of age at the time of the injury.

The appellee, testifying in his own behalf, stated that she was still on crutches at the time of the trial; that any attempt to walk without the crutches caused her ankle to turn and be very painful; that she had been on either one or two crutches since the date of the accident; that she had worn no high heel shoes since the date of the accident. The appellee stated that she had not been able to do her housework since the date of her injury, as she was accustomed to do before the accident; and that she had not been able to assist her husband in his church work, as she had done before the accident, or to play any musical instruments, or to engage in other activities such as bowling, hunting or walking; that she had incurred bills for medicine and doctor's visits, which were marked for identification. Other witnesses corroborated the appellee's testimony concerning her inability to do her house work or engage in other activities such as those mentioned above since the date of her injury.

As stated above, the amount of the verdict, in our opinion, is grossly excessive, in view of the nature of the plaintiff's injuries and medical testimony, so excessive in fact as to evince bias and prejudice on the part of the jury. Walker v. Polles, 248 Miss. 887, 162 So. 2d 631 (1964); Pellerin Laundry Machine Sales, Inc. v. Jeffcoats, 248 Miss. 781, 161 So. 2d 190 (1964); Cipriani v. Miller, 248 Miss. 672, 160 So. 2d 87 (1964); Gulfport Winn-Dixie, Inc., v. Taylor, 246 Miss. 332, 149 So. 2d 485 (1963); Elliott v. Massey, 242 Miss. 159, 134 So. 2d 478 (1961); Cooley and Quinn Drug & Chemical Co., Inc. v. Fillyaw, 242 Miss. 51, 134 So. 2d 153 (1961); Continental Southern Lines, Inc., v. Williams, 226 Miss. 624, 85 So. 2d 179 (1956) Brown & Root, Inc., v. Continental Southern Lines, Inc., 228 Miss. 15, 87 So. 2d 257 (1956); Canale v. Jones, 228 Miss. 317, 87 So. 2d 694 (1956); Planters Wholesale Grocery v. Kincade, 210 Miss. 712, 50 So. 2d 578 (1951). The appellee's attor-

neys have cited no case in which this Court has sustained a verdict as large as the verdict in this case for similar injuries. According to the testimony of both doctors the plaintiff suffered no fracture of bones of the ankle or foot, and according to the testimony of Dr. E. J. Holder the continued swelling of the right ankle was not due entirely to the injuries complained of in the plaintiff's declaration, but was due in part to other causes which produced swelling in both ankles.

The judgment appealed from will therefore be reversed and a new trial granted unless the appellee agrees to enter a remittitur of $12,500 within twenty days from the date of the judgment of this Court. If the appellee agrees to enter such remittitur the judgment of the lower court will be affirmed for $30,000, with interest thereon from the date of the judgment appealed from at the rate of six per cent per annum; otherwise the judgment against the appellants will be reversed and the case remanded for a new trial on the question of damages only.

Affirmed with remittitur.

*Gillespie, Rodgers, Jones and Brady, JJ.,* concur.